**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Andrea Barrett,

                Plaintiff,

                                      Civ. No. 07-2165 (RHK/JSM)
                                      **MEMORANDUM OPINION AND**
                                      **ORDER**

v.

Inver Grove Motors, LLC, d/b/a Denny
Hecker's Inver Grove Toyota VW,
Walden Fleet Sales Group, Inc., and
Denny Hecker's Automotive Group, Inc.,
d/b/a Denny Hecker Automotive Group,

                Defendants.

Steven Andrew Smith, Amy S. York, Nichols Kaster, P.L.L.P., Minneapolis, Minnesota, for Plaintiff.

Thomas A. Harder, Foley & Mansfield, P.L.L.P., Minneapolis, Minnesota, for Defendants.

**INTRODUCTION**

      Plaintiff Andrea Barrett has sued her former employer, Inver Grove Motors, LLC, d/b/a Denny Hecker's Inver Grove Toyota VW, Walden Fleet Sales Group, Inc., and Denny Hecker's Automotive Group, Inc., d/b/a Denny Hecker's Automotive Group (collectively, "Hecker"), alleging that her employment was terminated for discriminatory and retaliatory reasons. Hecker has moved for summary judgment on all of Barrett's claims. For the reasons set forth below, the Court will grant the Motion.

## BACKGROUND

Barrett began working for Hecker's Inver Grove Toyota (the "Toyota Store") in November 2006 as a Finance and Insurance ("F&I") Manager. (Barrett Dep. at 42.) The Toyota Store employed three F&I Managers: Charles Widman, Spencer Walters, and Barrett. (Id.) The F&I Mangers were responsible for seeing customers, delivering vehicles, processing paperwork, and selling finance services. (Cadle Dep. at 20.) They reported to Kevin Shafer, F&I Director. (Barrett Dep. at 42.) Shafer reported to Carrie Haugerud, General Sales Manager. (Haugerud Dep. at 11, 31.) Haugerud reported to Gary Lange, General Manager. (Id. at 12, 31.) The F&I employees were also overseen by John Cadle, Director of Finance. (Cadle Dep. at 13-14; Jerich Dep. at 12.) Cadle reported to Barbara Jerich, Hecker's President and Chief of Staff. (Jerich Dep. at 9, 23.)

In November 2006, Haugerud became aware that Barrett had "tardiness issues." (Haugerud Dep. at 22-24; Barrett Dep. at 66-67; Shafer Dep. at 51-52.) On one particular occasion, Barrett advised Widman that she would be a few minutes late, but would stop to pick up coffee for everyone. (Haugerud Dep. at 24.) According to Haugerud, however, Barrett came in 1 and 1/2 hours late. (Id.) Barrett acknowledges the incident, admits that she was late, but contends that she was only 20 minutes late. (Barrett Dep. at 66-67.) Haugerud spoke with Barrett "a few times" in November about her tardiness, but did not write her up for it. (Haugerud Dep. at 22.)

Barrett's tardiness continued during the first week of December 2006. (Barrett Dep. at 70; Cadle Dep. at 38; Shafer Dep. at 51; Harder Aff. Ex. F.) On December 5,

2

2006, Barrett alleges that Shafer told her that the only reason she was hired was because she is "Asian and female." (Barrett Dep. at 93.) The next day, Barrett informed Haugerud and Cadle of Shafer's comment. (Lange Aff. ¶¶ 3-4.) Cadle then called Jerich regarding Shafer's alleged statement; Jerich instructed Cadle to write Shafer up for the comment. (Jerich Dep. at 69; Cadle Dep. at 33.) That same day, Haugerud, Cadle, and Lange met with Shafer to discuss Barrett's allegation. Shafer strongly denied making the statement, but he was still written up for it. (Haugerud Dep. at 15-16; Cadle Dep. at 35-36; Lange Aff. ¶ 4; Shafer Dep. at 46.) Following that meeting, Cadle and Haugerud then met with Barrett to address her tardiness issues, explaining that they were aware that she had been "tardy several times [during the first week of December] and [has] been in the past." (Cadle Dep. at 43-44.) They reminded her "that she held a vital position within the store and that it was her obligation to make sure that she arrived on time . . . ." (Id. at 44.) Barrett's excuses for her tardiness were along the lines of "the alarm clock did not go off" or "did not sleep well." (Id. at 44-45.)

On December 8, 2006, Shafer sent an e-mail to Cadle documenting Barrett's tardiness from the first week of December:

> With regards to Annie Barrett, she has been late on a regular basis as of late. Saturday, Dec 2nd she was scheduled for 8[:]30 and she arrived at 9[:]30. Monday she was scheduled for 9 am and she arrived at 9[:]30. Tuesday December 5th she was scheduled for 1 pm and she arrived at 1:24 pm. . . . I told her that regardless of personal issues, timeliness is required and I would expect her to be her[e] before her scheduled time. I did not write her up on a discipline form as I hope that she will conform.

(York Aff. Ex. D.)  Barrett admitted that Shafer spoke to her about her tardiness that week.  (Barrett Dep. at 70.)  Barrett, however, believed that Shafer was "micromanaging and being overzealous with the time issues," especially when she left the dealership to get food or run errands.  (Id. at 97-100.)

On December 13, 2006, Haugerud and Cadle met with Barrett to discuss the fact that "[s]he has been showing up late to work on several occasions."  (York Aff. Ex. B.)  Barrett admits that during the course of this meeting, she was given a verbal warning that her tardiness "would no longer be tolerated."  (Id.; Barrett Dep. at 105.)  Later that month, Barrett complained to Haugerud that Shafer was giving more finance deals to the other two F&I Managers.  (Haugerud Dep. at 47; Barrett Dep. at 92-93.)  Although Hecker maintained a profit-per-vehicle ranking of F&I Managers, the profits of the F&I Department were shared equally.  (Haugerud Dep. at 48; Barrett Dep. at 49-50.)  Barrett, however, considered the profit-per-vehicle ranking to be a matter of pride.  (Pl.'s Opp'n Mem. at 9.)  In January 2007, Barrett received more finance deals and achieved the second highest profit-per-vehicle ranking of the F&I Managers.  (Haugerud Dep. at 47; Barrett Dep. at 93; York Aff. Ex. A.)

Barrett's tardiness, however, continued into January 2007.  (Lang Aff. ¶ 6.)  She was late for work on January 15, 16, and 17.  (Id.)  She received a written warning for her tardiness on January 17.  (Haugerud Dep. at 54-56; York Aff. Ex. F.)  Haugerud warned Barrett that if she was late again then she would be suspended.  (Id.)  Cadle also reminded Barrett not to be late to the mandatory meeting that was scheduled for the

4

following day. (Barrett Dep. at 75.) The next day, Barrett showed up late for that meeting. (Id. at 73.) When she arrived, the door was locked and those who had arrived late were not permitted entrance. (Id.) Nervous, Barrett exchanged text messages with Shafer, who was inside the meeting. (Id. at 116; Shafer Dep. at 33-34, 77; York Aff. Ex G.) Barrett asked Shafer if she was going to get fired and he responded that he did not think so. (Shafer Dep. at 77.) Ultimately, Haugerud suspended Barrett and told her not to return to work until Monday, January 22, when Haugerud and Lange planned to discuss her tardiness. (Barrett Dep. at 125-26; Lange Aff. ¶ 6.)

Haugerud and Lange met with Barrett on January 22, but Barrett was late for this meeting. (Lange Aff. ¶ 7.) Lange "couldn't believe that [they] were again discussing her tardiness." (Id.) Barrett explained that she had overslept because of some medication she had taken. (Id.; Haugerud Dep. at 30.) Lange "considered this excuse to be very inadequate and made the decision to fire her on the spot." (Lange ¶ 7.) In response, Barrett shook Lange's hand and "thanked him for being a good boss." (Barrett Dep. at 128.)

A few days later, Barrett requested to meet with Cadle. (Barrett Dep. at 142.) Cadle agreed to meet with Barrett, but asked Jerich to attend as well. (Cadle Dep. at 54.) Barrett asked why she had been fired, and was told that it was due to her tardiness. (Barrett Dep. at 149.) Barrett told Jerich and Cadle that she felt she had been treated differently than the other employees and that Shafer had monitored her time more closely than the other employees. (Jerich Dep. at 54-55.) Jerich asked Barrett if she would be

5

interested in an equivalent position at another Hecker store. (Id. at 55-56.) Barrett indicated that she would consider it. (Cadle Dep. at 58.) Cadle agreed with trying to find another position for Barrett within the Hecker organization because he felt "she was good . . . she did what she was supposed to do *when she was there*." (Id. at 58-59 (emphasis added).) At the end of the meeting, Barrett gave Cadle a "thank you" card which read as follows: "Dear John, I really appreciate your taking the time to see me today, and for always having made the time to speak with me. I sincerely *apologize for my tardiness* to last week's meeting." (Harder Aff. Ex. H (emphasis added).)

Shortly thereafter, Cadle called Barrett and left her a message for her to call him back – presumably to discuss an open position at another Hecker store. (Barrett Dep. at 139-40.) Barrett never returned his call because she "didn't want to work for the company anymore." (Id. at 141.)

On May 3, 2007, Barrett commenced this action, alleging claims for gender discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act (the "MHRA"), Minn. Stat. § 363A.01 *et seq.* Hecker now moves for summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the

6

material facts in the case are undisputed. Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**ANALYSIS**

**I.  The legal framework**

Claims under Title VII are analyzed using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Recio v. Creighton Univ., 521 F.3d 934, 938 (8th Cir. 2008).[1] The same standard applies to claims under the MHRA. See, e.g., Sigurdson v. Isanti County, 386 N.W.2d 715, 719-20 (Minn. 1986). In order to survive summary judgment under the McDonnell Douglas framework, Barrett must first establish a *prima facie* case for her claims of gender discrimination and retaliation.

---

[1] A different analysis applies when a plaintiff proffers "direct evidence" of discrimination. See, e.g., Gross v. FBL Fin. Servs., Inc., 526 F.3d 356, 359-60 (8th Cir. 2008). Barrett concedes that she has proffered no such evidence and that her claims should be evaluated under McDonnell Douglas. (See Pl.'s Opp'n Mem. at 17 n.2.)

7

In order to establish a *prima facie* case of *gender discrimination*, Barrett must show that "(1) she was a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) there are facts that give rise to an inference of unlawful gender discrimination." Wells v. SCI Mgmt., L.P., 469 F.3d 697, 700 (8th Cir. 2006).

In order to establish a *prima facie* case of *retaliation*, Barrett must show that "(1) [she] engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." Brenneman v. Famous Dave's of Am., Inc., 507 F.3d 1139, 1146 (8th Cir. 2007) (emphasis added).

If Barrett establishes a *prima facie* case, the burden shifts to Hecker to articulate a legitimate, nondiscriminatory (or nonretaliatory) reason for the challenged employment action. E.g., Culton v. Mo. Dep't of Corr., 515 F.3d 828, 830 (8th Cir. 2008); Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007). If Hecker does so, then Barrett must demonstrate that the proffered reason is a pretext. Culton, 515 F.3d at 830.

Hecker acknowledges that Barrett has established a *prima facie* case of gender discrimination, but argues that she has failed to establish a *prima facie* case of retaliation. Yet, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." Riser v. Target Corp., 458 F.3d 817, 820-21 (8th Cir. 2006) (quoting

United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) (internal quotation omitted)). Here, Hecker has articulated a legitimate, nondiscriminatory and nonretaliatory reason for Barrett's termination – her tardiness. Thus, the Court "need not indulge the parties' disputes about which material facts are in dispute or whether [Barrett] met [her] burden in establishing a prima facie case under McDonnell Douglas . . . ." Riser, 458 F.3d at 820-21; accord Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007) ("if an employer has articulated a legitimate reason for its actions, it is permissible for courts to presume the existence of a prima facie case and move directly to the issue of pretext"); Hervey v. County of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008) (jumping directly to the "ultimate question of discrimination *vel non*."). As such, the Court will proceed directly to the key question in this case: Has Barrett adduced sufficient evidence to create a genuine issue that the proffered reason for her termination was pretextual? The answer is no.

**II.     Barrett has failed to show that the proffered reason for her termination was pretextual**

There are at least two ways by which a plaintiff can create a question of fact regarding pretext. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006). First, a plaintiff can show pretext with evidence that "the employer's proffered explanation is unworthy of credence because it has no basis in fact." Id. at 1120 (internal quotations and citations omitted). Second, a plaintiff can show pretext "by persuading the court that a [prohibited] reason more likely motivated the employer." Id. (internal quotations and citations omitted) (alteration in original). In essence,

> [a]n employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees . . . were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

Stallings v. Hussman Corp., 447 F.3d 1041, 1052 (8th Cir. 2006).

Here, Barrett relies on the same evidence to show pretext for both of her claims that similarly situated employees were treated more leniently than her. In particular, she argues that Shafer scrutinized her punctuality more than Widman and Walters, which ultimately led to accumulated discipline and her termination. (Pl.'s Opp'n Mem. at 28-29, 34-36.)

The test to determine if one is "similarly situated" is "rigorous" at the pretext stage. Bearden v. Int'l Paper Co., 529 F.3d 828, 833 (8th Cir. 2008) (citation omitted). Barrett must show that she and the employees outside of her protected group were similarly situated in all relevant respects. Wheeler v. Aventis Pharms., 360 F.3d 853, 858 (8th Cir. 2004). And "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'" Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972-73 (8th Cir. 1994).

It is true that Barrett, Widman, and Walters were supervised by Shafer. But that is where the similarity ends. The record shows that Widman was late once due to a scheduling mix-up; all other evidence shows that Widman and Walters were never late. (Barrett Dep. at 65-66; Lange Aff. ¶ 10; Walters Aff. at 2.) Barrett, however contends that Widman and Walters told her that they were late. (Barrett Dep. at 64-66.) This is

inadmissible hearsay and will not be considered by the Court. See Brooks v. Tri-Systems, Inc., 425 F.3d 1109, 1111 (8th Cir. 2005) (explaining that when an affidavit contains an out-of-court statement which is offered for the truth of the statement, it is considered inadmissible hearsay and "may not be used to support or defeat a motion for summary judgment.").[2]

Unlike Widman and Walters, Barrett had a track record of repeated tardiness. Her tardiness began before she complained about Shafer's alleged statement and continued thereafter. Indeed, the most recent occasions on which she was tardy belies Barrett's contentions that she was subjected to more scrutiny by Shafer. Cadle and Haugerud verbally warned Barrett that her tardiness would no longer be tolerated. Thereafter, Haugerud – not Shafer – warned Barrett in writing that she would be suspended if she was late again. Cadle – not Shafer – reminded Barrett not to be late to the mandatory meeting that was scheduled on January 18. Despite these warnings, she was late for that meeting. Notably, she was worried that she would be fired for her tardiness. Haugerud – not Shafer – then suspended her for her chronic tardiness. And following her suspension, Barrett was late for the meeting with Haugerud and Lange to discuss her tardiness from the week before. Lange – not Shafer – made the decision to fire her on the spot because

---

[2] Barrett also argues that "there were a lot of exaggerations" by Shafer with respect to her punctuality. (Pl.'s Opp'n Mem. at 25, 32.) But at the pretext stage, "the key question is not whether the stated basis for termination actually occurred but whether the defendant believed it to have occurred." Macias Soto v. Core-Mark-Int'l, Inc., 521 F.3d 837, 842 (8th Cir. 2008). Barrett has presented no evidence to show that Hecker did not believe that she had established a record of chronic tardiness. Indeed, Barrett's contentions lack merit; she was admittedly late to meetings at which Shafer had no opportunity to exaggerate her tardiness.

he considered her excuse that she had overslept to be inadequate. This does not support a finding that Barrett was treated differently or subjected to more scrutiny by Shafer.[3]

Barrett points to <u>Roberts v. Park Nicollet Health Services</u>, 528 F.3d 1123 (8th Cir. 2008), to support her argument that her tardiness was not the only reason that motivated Hecker to fire her. In <u>Roberts</u>, the plaintiff had compiled a problematic attendance record during the first three months of her employment. <u>Id.</u> at 1124-25. After arriving late to work on one particular occasion, the employer suspended the plaintiff and warned her that her employment would be terminated the next time she was late to work. <u>Id.</u> at 1125. In the fourth month of her employment, the plaintiff had been scheduled to undergo an MRI scan for a work-related injury to her arm. <u>Id.</u> The plaintiff allegedly informed her supervisor that she canceled the appointment because she had just found out that she was pregnant. <u>Id.</u> Her supervisor allegedly sighed and asked, "What are you going to do about the pregnancy, are you going to keep it?" or "Are you and your husband going to keep it?" <u>Id.</u> The following day, the plaintiff called her supervisor to let her know that she was going to be late due to traffic. <u>Id.</u> The next day, the supervisor terminated the plaintiff's employment for tardiness. <u>Id.</u> at 1125-26.

The plaintiff then filed a lawsuit against her employer for pregnancy discrimination under Title VII and the MHRA. <u>Id.</u> at 1126. The District Court granted summary judgment for the employer, concluding that there was no genuine issue of

---

[3] Barrett's argument that she was treated differently because Shafer had given more finance deals to the other two F&I Managers is not evidence of pretext given that she received such opportunities and that each F&I Manager received an equal share of the profits.

material fact about whether the employer's stated reason for the termination was a pretext for discrimination.  Id.  The Eighth Circuit reversed and held that "there is a genuine dispute for trial concerning whether [the employer's] claim that the termination was motivated solely by [the plaintiff's] record of tardiness is pretextual, and whether [the plaintiff's] pregnancy was a motivating factor in the employment decision."  Id. at 1128.  The Court found that there were substantial credibility disputes as to the employer's explanation for the termination and whether the plaintiff even notified her supervisor of the pregnancy before her supervisor decided to fire her.  Id. at 1128-29.

Roberts is easily distinguished from this case.  Here, Shafer's alleged discriminatory statement about Barrett lacks the temporal proximity with her termination that was present in Roberts.  Unlike Barrett, the plaintiff in Roberts was fired two days after her supervisor made the alleged discriminatory statements.  Furthermore, the supervisor in Roberts was a key decision maker in the employment action.  By contrast, there is no evidence that Shafer was involved in the decision to terminate Barrett.  See Ghane v. West, 148 F.3d 979, 982 (8th Cir. 1998) (comment insufficient to show pretext because "there is no evidence that the remark was either made by a decision maker or made in connection with the decisional process").  And unlike Roberts, the connection between Shafer's alleged discriminatory statement and Barrett's termination is simply too tenuous to demonstrate pretext.

Barrett also attempts to show pretext by arguing that despite her termination, Jerich and Cadle were interested in keeping her employed in the Hecker organization.  In

13

particular, she argues that "[a]n employer that was truly overwhelmed with an employee's poor performance would have no obligation, and certainly no inclination, to rehire that employee mere days after her termination." (Pl.'s Opp'n Mem. at 26, 35.) Barrett's argument misses the mark. Hecker did not fire her for poor performance; rather, it fired her for her repeated tardiness. The record shows that Cadle testified that he felt Barrett "was good . . . she did what she was supposed to do *when she was there*." (Cadle Dep. at 58-59 (emphasis added).) This does not demonstrate a discriminatory or a retaliatory animus. If anything, this evidence shows that Hecker was attempting to give Barrett another opportunity despite her tardiness. And the Eighth Circuit has made it abundantly clear that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." Harvey, 38 F.3d at 973. At the end of the day, Barrett has simply "throw[n] strands of speculation on the wall [to] see if any of them will stick." Richardson v. MCF Stillwater, Civ. No. 04-4935, 2006 WL 47339, at *5 (D. Minn. Jan. 9, 2006) (Doty, J.). When viewed in the light most favorable to Barrett, she has failed to create a genuine issue as to whether Hecker's proffered reason for her termination was pretextual. Accordingly, her claims fail as a matter of law.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 31) is

**GRANTED** and Plaintiffs' Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 26, 2008                           s/Richard H. Kyle
                                                  RICHARD H. KYLE
                                                  United States District Judge